## In re PARTY CITY SECURITIES LITIGATION.

No. Civ.A. 99–1353 (AJL).

United States District Court,
D. New Jersey.

Aug. 6, 1999.

Seth R. Lesser, Bernstein Litowitz Berger. & Grossmann, Fort Lee, New Jersey, for Charles P. Barry, Jr., and Klein plaintiffs' group.

. Robert S. Gans, Gerald H. Silk, Bernstein Litowitz Berger & Grossmann, New York City, Vero Beach, Florida, for Charles P. Barry, Jr.

James V. Bashian, Fairfield, New Jersey, for Baldassare Maietta.

Gary S. Graifman, Kantrowitz, Goldhamer & Graifman, Montvale, New Jersey, for Mike Tabbert and Opus GT Partners.

Peter S. Pearlman, Jeffrey W. Herrmann, Cohn Lifland Pearlman, Herrmann & Knopf, Saddlebrook, New Jersey, for LaVerne Catanzarite and George Hormel.

Marian P. Rosner, Paul O. Paredis, Wolf Popper, New York City, for LaVerne Catanzarite.

William Pinilis, Bross, Zipkin & Pinilis, Newark, New Jersey, for Robert Klein and Gail Shiffrin.

Joseph H. Weiss, Weiss & Yourman, New York City, Jules Brody, Stull, Stull & Brody, New York City, for Opus GT Partners.

Robert J. Berg, Bernstein Liebhard & Lifshitz, Fort Lee, New Jersey, for Harold Weber.

Mel E. Lifshitz, Bernstein Liebhard & Lifshitz, New York City, Allyn Z. Lite, Gold-

stein Lite & DePalma, Newark, New Jersey, for David Sacher, Ira Gross and Tim Flynn.

Samuel H. Rudman, Milberg Weiss Bershad Hynes & Lerach, New York City, for David Sacher and Klein plaintiffs' group.

Shepard & Geller, Boca Raton, Florida, Neil Rosenthein, Scott & Scott, Colchester, Connecticut, for David Sacher.

Curtis V. Trinko, New York City, for Ira Gross.

Andrew R. Jacobs, Fitzsimmons Ringle & Jacobs, Newark, New Jersey, Fred Taylor Isquith, Shane T. Rowley, Wolf Haldenstein Adler, Freeman & Herz, New York City, for Stanley Kurzweil.

Jeffrey C. Block, Michael T. Matraia, Kathryn A. McElroy, Berman, Devalerio & Pease, Boston, Massachusetts, for George Hormel.

Frederick S. Fox, Janine R. Azrillant, Kaplan, Kilsheimer & Fox, New York City, for Klein plaintiffs' group.

Jerald Stein, New York City, Richard J. Vita, Boston, Massachusetts, Stephen Greiner, Willkie, Farr & Gallagher, New York City, for defendants.

Jeffrey Greenbaum, Sills Cummis Radin Tischman, Epstein & Gross, Newark, New Jersey, for defendants.

## OPINION

LECHNER, District Judge.

This is an action for securities fraud brought on behalf of purchasers of Party City Corporation ("Party City") common stock ("Party City Stock"), seeking damages for violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78t(a) and 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, from Party City, Steven Mandell ("Mandell") and David Lauber ("Lauber") (collectively, the "Defendants"). Jurisdiction is alleged pursuant to 28 U.S.C. § 1331.

Currently pending is a motion for the appointment of lead plaintiffs (the "Lead Plaintiffs Motion") and approval of the selection of lead counsel (the "Lead Counsel Motion"), pursuant to § 21D(a)(3) of the Exchange Act, as amended, 15 U.S.C. § 78u4(a)(3). The Lead Plaintiffs and Lead Counsel Motions were filed on behalf of Todd Krasnow ("Krasnow"), Slater Asset Management, LLC ("Slater Asset") and Taylor Capital Management ("Taylor Capital") (the "Proposed Lead Plaintiffs") by both the Proposed Lead Plaintiffs and certain other class members (collectively, the "Movants") [1] representing the purchase of 480, 219 shares of Party City Stock.[2] For the reasons set forth below, the Lead Plaintiffs Motion is granted in part and denied in part; the Lead Counsel Motion is granted.

*Facts*[3]

A. *The Defendants*

Party City is a Delaware corporation with its principal executive offices in Rockaway,

---

**1.** The identity of each of the Movants is set forth in Exhibit A of the Affidavit of Michael S. Egan submitted in support of the Lead Plaintiffs and Lead Counsel Motions. The Movants are approximately 190 individuals and entities that have purchased Party City Stock. The Movants allege they purchased 482,249 shares of Party City Stock and suffered losses resulting from the purchase of Party City Stock in the amount of $4,252,468. In addition to the support for the Proposed Lead Plaintiffs offered by the Movants, thirteen of the eighteen law firms representing plaintiffs that have filed complaints in the instant action support the appointment of Proposed Lead Plaintiffs and their selection of co-lead counsel. *See* Moving Brief at 20.

**2.** In support of the Lead Plaintiffs and Lead Counsel Motions, the Proposed Lead Plaintiffs submitted:

1) memorandum of Law in Support of Proposed Party City Lead Plaintiffs' Motion for Appointment as Lead Plaintiffs and Approval of Their Selection Lead Plaintiffs' Selection of Lead Counsel (the "Moving Brief"); and

2) Affidavit of Michael S. Egan in Support of the Lead Plaintiffs and Lead Counsel Motions (the "Egan Aff.") with attached exhibits.

**3.** The facts are derived primarily from the class action complaints, filed before the consolidation of this matter on 24 May 1999, in *Harold Weber v. Party City Corporation, Steven Mandell and David Lauber,* Civil Action No. 99–1252 (the "*Weber* Action," "*Weber* Complaint") and in *LaVerne Catanzarite v. Party City Corporation, Steven Mandell and David Lauber,* Civil Action No. 99–1317 (the "*Catanzarite* Action," "*Catanzarite*

New Jersey. Party City is a discount retailer of party supplies. As of 31 December 1998, Party City owned and operated 207 Party City stores in the United States, and its franchisees operated an additional 167 stores in the United States, Puerto Rico, Canada, Spain and Portugal.

Mandell is the President, Chief Executive Officer, and a Director of Party City. Mandell is alleged to have signed quarterly reports on Form 10–Q filed by Party City with the Securities Exchange Commission (the "SEC"). Mandell is also alleged to have issued statements on behalf of Party City.

Lauber is the Chief Financial Officer, Principal Accounting Officer, and a Director of Party City. Lauber is alleged to have signed quarterly reports on Form 10–Q filed by Party City with the SEC. Lauber is also alleged to have issued statements on behalf of Party City.[4]

## B. The Proposed Lead Plaintiffs

The Proposed Lead Plaintiffs are a group consisting of Krasnow, Slater Asset and Taylor Capital. The Proposed Lead Plaintiffs have all reviewed either the *Weber* Complaint or a complaint filed in another action that has been consolidated into the instant case, and have expressed a willingness to serve as lead plaintiffs in the instant action.[5] *See* Egan Aff., Exh. C. (attaching certifications from each of the Proposed Lead Plaintiffs)

Krasnow made the following Party City Stock transactions during the Proposed Class Period:

| Date/Transaction | No. Shares | Price per share |
| --- | --- | --- |
| 9 July 1998 / Purchase | 8,000 | $24.75 |
| 21 July 1998 / Purchase | 2,000 | $23.00 |
| 4 August 1998 / Purchase | 5,000 | $19.875 |
| 21 August 1998 / Purchase | 5,000 | $15.12 |
| 3 September 1998 / Purchase | 5,000 | $10.9375 |
| 16 October 1998 / Purchase | 2,000 | $10.422 |
| 8 December 1998 / Purchase | 5,000 | $15.625 |
| 11 March 1999 / Purchase | 10,000 | $ 8.625 |

It appears Krasnow still holds all 42,000 shares of Party City Stock. Krasnow alleges losses resulting from his transactions in Party City Stock of $703,661.

Slater Asset made the following Party City Stock transactions during the Proposed Class Period:

Complaint"). The complaint filed in the *Weber* Action is relied upon for purposes of this motion because Harold Weber, named plaintiff in the *Weber* Action, was the first to file. In addition, the *Weber* Action, as the first filed action, serves as a preliminary basis for the timing and notice provisions of the PSLRA.

The *Catanzarite* Action is relied upon for the purposes of this motion because the class period alleged therein covers the longest class period alleged in the actions filed against the Defendants. The class period alleged by the Proposed Lead Plaintiffs mirrors the class period alleged in the *Catanzarite* Complaint. Although the various actions that comprise this consolidated action allege differing class periods, all complaints in this action premise liability on the same substantive misrepresentations, and all complaints filed in this action allege the class period closed as a result of the disclosure of the same information.

4. Defendants Mandell and Lauber are referred to collectively as the "Individual Defendants."

5. The Proposed Lead Plaintiffs seek to represent a class (the "Proposed Class") consisting of all persons who purchased Party City Stock between 26 February 1998 and 18 March 1999 (the "Proposed Class Period") and who suffered damages. *See* Moving Brief at 2. It is alleged that the members of the Class are so numerous that joinder of all members would be impracticable. *See Weber* complaint ¶ 13. Throughout the Proposed Class Period, Party City Stock was actively traded on the Nasdaq National Market ("Nasdaq"). *See id.* ¶ 20(b, e). While the exact number of members of the Class is not known, it is alleged there are possibly thousands of members. *See id.* ¶ 13.

| Date/Transaction | No. Shares | Price per share |
|---|---|---|
| 27 January 1999 / Purchase | 5,000 | $17.875 |
| 27 January 1999 / Sale | ( 5,000) | $18.656 |
| 28 January 1999 / Purchase | 26,000 | $17.958 |
| 2 February 1999 / Purchase | 4,500 | $17.75 |
| 8 February 1999 / Purchase | 4,000 | $16.625 |
| 17 February 1999 / Purchase | 5,000 | $16.563 |
| 18 February 1999 / Purchase | 4,000 | $16.250 |
| 22 February 1999 / Purchase | 3,000 | $15.938 |
| 25 February 1999 / Purchase | 4,000 | $15.125 |
| 9 March 1999 / Purchase | 4,000 | $ 8.75 |

On 19 March 1999, Slater Asset sold 16,000 shares of Party City Stock at $3.625 per share. It appears Slater Asset still holds 38,500 shares of Party City Stock. Slater Asset alleges losses resulting from its transactions in Party City Stock of $842,507.

Taylor Capital made the following Party City Stock transactions during the Proposed Class Period:[6]

| Date/Transaction | No. Shares | Price per share |
|---|---|---|
| 30 October 1998 / Purchase | 7,500 | $17.6875 |
| 17 December 1998 / Sale | ( 200) | $13.875 |
| 18 December 1998 / Sale | ( 5,000) | $13.75 |
| 18 December 1998 / Sale | ( 5,000) | $13.875 |
| 21 December 1998 / Sale | ( 6,800) | $13.875 |
| 27 January 1999 / Purchase | 30,000 | $18.2224 |
| 17 March 1999 / Sale | (30,000) | $ 7.0404 |

It appears Taylor Capital no longer holds any shares of Party City Stock. Taylor Capital alleges losses resulting from its transactions in Party City Stock of $364,053.

C. *Procedural History*

The instant action is a consolidation of several cases filed against Party City, Man-dell and Lauber seeking to recover for alleged violations of the Exchange Act. The following related cases were consolidated into this action:

| Plaintiff and Civil Action No. | Date of Consolidation Order |
|---|---|
| 1) LaVerne Catanzarite, Civil Action No. 99–1317 | 26 March 1999 |
| 2) Robert Klein and Gail Shiffrin, Civil Action No. 99–1325 | 26 March 1999 |
| 3) Opus GT Partners, Civil Action No. 99–1327 | 26 March 1999 |
| 4) Tim Flynn, Civil Action No. 99–1328 | 26 March 1999 |
| 5) Mike Tabbert, Civil Action No. 99–1353 | 26 March 1999 |
| 6) Baldassare Maietta, Civil Action No. 99–1386 | 29 March 1999 |
| 7) Charles P. Barry, Civil Action No. 99–1453 | 31 March 1999 |
| 8) Harold Weber, Civil Action No. 99–1252 | 8 April 1999 |
| 9) George Hormel, Civil Action No. 99–1689 | 14 April 1999 |
| 10) Stanley R. Kurzweil, Civil Action No. 99–1396 | 24 May 1999 |

6. Prior to the commencement of the Proposed Class Period, Taylor Capital had purchased 11,-500 shares of Party City Stock. It effected purchases on 21 and 24 November 1997 and 17 December 1997 of 1,000 shares at $19.00 per share, 9,000 shares at $19.1361 per share and 1,500 shares at $19.00 per share, respectively.

11) David Sacher,
 Civil Action No. 99–2238 24 May 1999
12) Ira Gross,
 Civil Action No. 99–2355 24 May 1999

Proposed Lead Plaintiffs filed the Lead Plaintiffs and Lead Counsel Motions on 21 may 1999. Also on 21 May 1999, the self-titled Klein Plaintiffs' Group (the "Klein Plaintiffs' Group")[7] submitted a motion for appointment of lead plaintiffs and for approval of their selection of lead counsel.

By a letter from the court, dated 25 May 1999, all parties to the instant action were informed of the motions filed by Proposed Lead Plaintiffs and the Klein Plaintiffs' Group. By letter, dated 27 May 1999, the Klein Plaintiffs' Group withdrew its motion for appointment of lead plaintiffs and selection of lead counsel. Accordingly, only the Lead Plaintiffs Motion and Lead Counsel Motion remain for consideration.

### D. *The Factual Allegations*

As stated, Party City is a retailer of party supplies. Party City operates a network of company owned retail outlets in the United States and its franchisees operate outlets in the United States, Puerto Rico, Canada, Spain and Portugal.

The Proposed Class alleges Defendants disseminated materially false and misleading information concerning the financial condition of Party City in order to artificially inflate the price of Party City Stock. *See Weber* Complaint at ¶ 48. The Proposed Class further alleges the financial, and accounting systems employed by Party City were in disarray, causing the financial results reported by Party City during the Proposed Class Period to be materially inaccurate and overstated. *See id.* The Proposed Class asserts that as a result of the alleged misrepresentations and omissions of the Defendants the true operating status and financial condition of Party City was not known. *See id.* It is alleged this misinformation caused Party City Stock to trade at artificially high prices during the Proposed Class Period. *See id.*

7. The Klein Plaintiffs' Group was a group consisting of one institutional investor and eight

The following press releases, reports and statements are alleged to have been materially false and misleading.

### *The 26 February 1998 Press Release*

On 26 February 1998, Party City issued a press release (the "26 February Press Release") announcing its 1997 fourth quarter and year-end results. The 26 February 1998 Press Release stated net income for the fourth quarter of 1997 increased 137% to $7,305,000, or $.57 per "diluted share," compared with net income of $3,077,000, or $.29 per diluted share, for 1996. The 26 February 1998 Press Release further stated net income for fiscal year 1997 increased 104% to $7,670,000, or $.64 per diluted share, compared to net income of $3,756,000, or $.38 per diluted share, for fiscal year 1996. Commenting on the 1997 fiscal year results, Mandell stated:

> "We are delighted with the strong sales and earnings results Party City achieved in 1997. Despite our aggressive store opening schedule, we were able to manage our growth effectively, as evidenced by our improved operating margin. We are also very pleased with the 16% comparable store sales growth in 1997, compared with the 18% comparable store sales growth achieved in 1996. *These solid results are testimony to the management team and the support systems we have put into place to manage our expansion.*"

> "As we head into 1998, we have already made significant head way in our aggressive store opening schedule. We have opened six company-owned stores this year, as compared to two store openings at this point last year. We have signed 38 leases for additional company-owned store locations to open in 1998. With such a healthy head start this early in the year, we are confident in our ability to accomplish our 1998 expansion plans."

individual investors.

*Catanzarite* Complaint ¶ 23 (quoting 26 February 1998 Press Release) (emphasis in Catanzarite Complaint).

The 26 February 1998 Press Release also announced that Party City had received a letter of commitment from PNC Bank. This letter of commitment concerned a new, three year revolving credit facility which increased the line of credit of Party City to $60 million, up from $20 million.

*The 1997 Form 10–K*

On 31 March 1998, Party City filed its 1997 Form 10–K (the "1997 Form 10–K") with the SEC. In addressing its internal inventory controls, Party City stated:

"The Company's management continuously reviews new and existing product selections to provide the widest and most current assortment of party supplies. In pursuit of this goal, management attends various industry trade shows including the National Annual Halloween Trade Show in Rosemont, Illinois and the Toy Fair in New York. In an effort to keep abreast of new and popular merchandise, management views presentations given specifically for the Company by its major vendors. *The Company utilizes its inventory tracking system to give the purchasing staff constant feedback on customers' preferences.*

"All of the merchandise purchased by the Super Stores is shipped directly from suppliers to the stores. *The purchasing decisions and inventory control are facilitated by the use of sophisticated point-of-sale inventory control technology.* Almost all merchandise is bar coded either by the supplier prior to delivery or at the time of receipt at the store. Consistent with the Party City Super Store concept, almost all inventory is displayed on the shelves with little or no space used for stocking.

"*The MIS system is a vital tool for increasing the efficiency of store operations.* The Company believes that its management information system is an important factor in allowing the Company to support its rapid growth and enhance its competitive position in the industry. Through the MIS system, store managers are able to quickly evaluate the sales performance of

their stores and of individual items in their stores, while also replenishing stock shelves in a timely fashion. Typically, *merchandise is received already bar coded, enabling managers to control inventory and pricing by SKU, to manage assortment within a category, and to analyze gross margins and inventory turnover.*"

*Catanzarite* Complaint ¶ 24 (quoting 1997 Form 10–k) (emphasis in Catanzarite Complaint).

*The 9 April 1998 Press Release*

On 9 April 1998, Party City announced its sales results for the first quarter of 1998 (the "9 April 1998 Press Release"). The 9 April 1998 Press Release reported revenues for the first quarter of 1998 increased 179% to $40.7 million, up from $14.6 million for the same period in 1997. The 9 April 1998 Press Release further reported sales from company-owned stores for the quarter ended 31 March 1998 increased 206% to $38.7 million, up from $12.6 million in the first quarter of 1997.

Party City also announced:

"Party City opened a total of 14 new stores during the first quarter, 12 of which are company-owned and two of which are franchised. In addition, one franchise store was acquired during the quarter, located in the Miami, Florida market. As of March 31, 1998, a total of 288 Party City stores were in operation, compared to 209 stores last year, an increase of 38%. As of April 1, 1998, additional leases for 38 company-owned stores and four franchise stores have been signed for openings this year."

*Catanzarite* Complaint ¶ 26 (quoting 9 April 1998 Press Release).

The 9 April 1998 Press Release quoted Mandell as stating:

"We are pleased with our continued strong sales results in the first quarter. We expect the calendar shift of Easter into the month of April to help fuel continued sales growth in the second quarter, as initial sales results look solid."

*Catanzarite* Complaint ¶ 27 (quoting 9 April 1998 Press Release).

*The 23 April 1998 Press Release*

On 23 April 1998, the Company announced its financial results for the first quarter of 1998 (the "23 April 1998 Press Release"). The 23 April 1998 Press Release noted that while Party City had experienced a net loss of $.10 per share for the period, total revenues for the period increased 179% to $40.7 million, up from $14.6 million for the same period in 1997. Addressing the results for the first quarter of 1998, Mandell stated:

> "We are pleased with the results we achieved in the first quarter. Due to the calendar shift of Easter this year, we expanded our promotional program during the month of March and were successful in generating store traffic and sales. We were able to do this and still improve margins for the quarter versus a year ago. Early sales indications in the month of April thus far are solid, which positions us well for the remainder of the quarter.
>
> "During the first quarter we exceeded our internal store opening plan by opening 12 company-owned stores. The store we opened in Toledo, Ohio is in a new market for Party City, and stores opened in San Antonio, California, Florida and the New York metropolitan area help to further penetrate these existing markets. *We are benefitting from our expanded infrastructure that has been put in place to support our growth.* For example, our broadened real estate team enables us to better canvas the country as we continue to look for home run store locations. To date, we have an additional 37 leases signed for 1998 openings, including new markets such as Seattle, Boston, Kansas City and Columbus, Ohio."

*Catanzarite* Complaint ¶ 28 (quoting 23 April 1998 Press Release) (emphasis in complaint).

*The 9 July 1998 Press Release*

On 9 July 1998, the Company announced its sales results for the second quarter and first six months of 1998 (the "9 July 1998 Press Release"). The 9 July 1998 Press Release stated the total revenues for the second quarter of 1998 increased 151.9% to $56.6 million, up from the same period in 1997. The 9 July 1998 Press Release further stated revenues in the first six months of 1998 increased 162.4% to $97.3 million, also up from 1997. The 9 July 1998 Press Release accentuated the rapid growth Party City was experiencing:

> "Party City opened a total of 20 new stores during the second quarter, 15 of which are company-owned and five of which are franchised. As of the end of the second quarter a total of 308 Party City stores were in operation, compared to 224 stores last year, an increase of 37.5%. Additionally, two new company-owned stores opened in early July, with the associated pre-opening costs booked as incurred in the second quarter. As of July 8, 1998, additional leases for 33 company-owned stores and six franchise stores have been signed for openings this year."

*Catanzarite* Complaint ¶ 29 (quoting 9 July 1998 Press Release).

Mandell commented:

> "The solid sales results we achieved in the second quarter are on target with our internal plan. Our 1998 store opening schedule is also tracking to our expectations. With 29 new company-owned stores already opened and another 33 signed leases, we are well positioned to reach our store opening goal for the year."

*Catanzarite* Complaint ¶ 30 (quoting 9 July 1998 Press Release).

*The 23 July 1998 Press Release*

On 23 July 1998, Party City issued a press release over the *Business Wire* announcing financial results for the second quarter and six months ended 30 June 1998 (the "23 July 1998 Press Release"). The 23 July 1998 Press Release reported net income for the second quarter increased 16.1% to $1,042,000, or $.08 per share on both a basic and diluted basis, compared to net income of $897,000 or $.07 per share for the same period in 1997. Party City reported a net loss for the first six months of 1998 of $229,000 or $.02 per share on both a basic and diluted basis, as compared to net income of $609,000 or $.05 per share for the same period in 1997. Party City attributed the net loss for the first six months to a higher interest expense, resulting from the efforts of Party City to fund its

aggressive growth, and to higher pre-opening expenses due to the greater number of stores opened in 1998 versus 1997.

Mandell commented:

"We are pleased to report our strong sales and earnings results for the second quarter. Earnings in the period were driven by our ability to improve store contribution margins while leveraging our G & A expenses over a wider sales base. We were able to achieve these improved results despite the significant pre-opening expenses incurred in the quarter due to our aggressive store expansion plans. We are confident that we will continue to efficiently execute our operating strategy and expect to meet our stated goals for the year."

*Weber* Complaint ¶ 22 (quoting 23 July 1998 Press Release).

### The 14 August 1998 Form 10–Q

On 14 August 1998, Party City filed its Form 10–Q, for the quarter ended 30 June 1998, with the SEC (the "14 August 1998 Form 10–Q"). The 14 August 1998 Form 10–Q was signed by Mandell and by Lauber. The 14 August 1998 Form 10–Q repeated the financial results set forth in the 23 July 1998 Press Release.

### The 2 September 1998 Press Release

On 2 September 1998, Party City issued a press release over the *Business Wire* (the "2 September 1998 Press Release") announcing it expected to report a net loss of between $.15 to $.18 per fully diluted share for the third quarter ending 30 September 1998. Party City stated this expectation was based upon lower than anticipated sales results for the months of July and August. Party City asserted the lower sales were due to less aggressive promotional pricing than in the comparable period the prior year, a more aggressive new store expansion effort, and delays in the acquisitions of five franchise stores.

Party City stated it believed its new store openings and franchise acquisitions had positioned Party City well for the important Halloween selling season. Party City further stated "management expects a portion of the revenues and income shortfall in the third quarter will be recouped in the fourth quarter of 1998 and remains comfortable that full year results will be in line with expectations." *Weber* Complaint ¶ 27 (quoting 2 September 1998 Press Release).

### The 3 September 1998 Star–Ledger Interview

On 3 September 1998, Lauber gave an interview to the *Star Ledger—Newark* (the "3 September 1998 *Star–Ledger* Interview"). Lauber addressed the 34% drop in the price of Party City Stock that had resulted from the release of expected third quarter numbers in the 2 September 1998 Press Release. Lauber stated the expected third quarter loss was tied to the costs of opening 52 new stores, compared with 34 new stores the prior year. Lauber stated "it was imperative to get these stores open in time for Halloween" so Party City could capture more business during its busiest season. *Weber* Complaint ¶ 29 (quoting 3 September 1998 *Star Ledger* Interview). Addressing the quarterly shortfall, Lauber said Party City made the mistake of offering shoppers fewer store-circular bargains that year. Lauber explained: "We thought there was an opportunity to pick up some dollars in our margins, so we did not promote on price as strongly in July and August.... It was an error on our part. But we're back on track." *Id.*

### The 3 September 1998 Dow Jones Interview

On 3 September 1998, Lauber gave an interview to the *Dow Jones News Service* (the "3 September 1998 *Dow Jones* Interview"). Lauber told *Dow Jones* he did not understand why investors had "been so skittish" about the stock: "The real issue is that the fundamentals of this business remain intact." *Weber* Complaint at ¶ 31 (quoting 3 September 1998 *Dow Jones* Interview). Lauber asserted Party City would recover some of the third quarter losses in the fourth quarter.

Lauber stated he was comfortable with the estimates of several analysts that earnings would be $.93 per share for 1998. Lauber noted that, given recent activity in the stock market, some investors may have been looking for reasons to sell Party City Stock. Lauber, however, maintained Party City was different from its competitors in that Party City offered a deeper selection, had a better

inventory system, and received better prices because of its purchasing power. Lauber also said that concerns about inventory levels were overblown: "We're very comfortable with our inventory levels." *Id.*

### The 8 October 1998 Press Release

On 8 October 1998, Party City announced sales results for the third quarter and nine months ended 30 September 1998 in a press release issued over the *PR Newswire* (the "8 October 1998 Press Release"). The 8 October 1998 Press Release reported revenues for the third quarter of 1998 increased 108.6% to $58.4 million, and sales from company-owned stores were reported to have increased 117.9% to $56.0 million. Total revenues for the nine months ended 30 September 1998 were reported to have increased 139.2% to $155.7 million, up from $65.1 million for the same period in 1997. Mandell commented that

> "during the third quarter, we opened 52 stores and entered a number of new, key markets including Boston, Kansas City and Salt Lake City. Our aggressive push during the quarter to open more stores, combined with the strong rebound in our September sales, places us in an excellent position to capitalize on the important Halloween season."

*Weber* Complaint ¶ 33 (quoting 8 October 1998 Press Release).

### The 23 October 1998 Bergen Record Report

On 23 October 1998, the *Bergen Record* reported Party City had reported a third quarter net loss of $2.16 million due to expenses related to opening 49 stores in the last three and one-half months. The third quarter loss was $.17 per share, compared to a loss of $.02 per share in the same period of 1997. Mandell commented:

> "Now that the third quarter is behind we are in a stronger position than ever to capitalize on the Halloween selling season....[Our new store opening] schedule is an aggressive yet prudent level of new store activity for the company. We believe that 50 to 60 new company-owned stores will enhance our leading competitive position within the party goods industry."

*Weber* Complaint at ¶ 35 (quoting 23 October 1998 *Bergen Record* Report).

### The 16 November 1998 Form 10–Q

On 16 November 16 1998, Party City filed its Form 10–Q for the quarter ended 30 September 1998 with the SEC (the "16 November 1998 Form 10–Q"). The 16 November 1998 Form 10–Q was signed by Mandell and by Lauber. The 16 November 1998 Form 10–Q repeated the financial results for the third quarter of 1998 and nine months ended 30 September 1998 set forth in the 8 October 1998 Press Release.

### The 19 November 1998 Press Release

On 19 November 1998, Party City issued a press release over the *PR Newswire* (the "19 November 1998 Press Release") announcing its sales results for the month of October 1998. Party City reported total revenues for October increased 82.5% to $85.4 million, up from $46.8 million for the same period in 1997. Mandell commented:

> "We are very excited to have exceeded our same store sales goal for the month of October. We attribute the 11.4% increase to a well executed direct mail advertising campaign, strong in-store marketing and merchandising and to the depth and breadth of our Halloween product offering .... Sales were strong across all regions, with particularly strong results in Chicago, Detroit and Minneapolis. Our Class of 1998 new stores performed above plan and experienced a stronger first Halloween than any other class year in the Company's history.... We are pleased with our strong results in October, which is [sic] as important to our business as December is for most retailers. The combination of our solid comp. store gain, the performance of our new stores and the excellent execution of our business during this important time of year gives Party City a solid platform from which to further grow the business."

*Weber* Complaint ¶ 39 (quoting 19 November 1998 Press Release).

### The 4 January 1999 Press Release

On 4 January 1999, Party City issued a press release over the *Business Wire* (the "4 January 1999 Press Release") announcing its

sales results for the fourth quarter and year ended 31 December 1998. The 4 January 1999 Press Release reported total revenues for the 1998 fourth quarter increased 81.5% to $138.7 million and total revenues for 1998 fiscal year increased 108.0% to $294.3 million. Defendant Mandell commented:

"Our comparable store performance reflects a strong start to the quarter due to our healthy Halloween season sales results. We were able to build on that momentum with an effective promotional program that helped to drive traffic throughout the November and December holiday selling season. These results underscore the excitement generated by our super store concept and our leading position in the party supply industry."

*Weber* Complaint ¶ 41 (quoting 4 January 1999 Press Release).

### The 1 March 1999 Press Release

On 1 March 1999, Party City issued a press release over the *Business Wire* (the "1 March 1999 Press Release") stating that in response to shareholder inquiries, Party City was offering its comments on the then current status of its year-end audit process. Party City reported:

"The Company is currently in the process of completing its year-end audit. The audit has taken longer than anticipated due to growth of the business; having 85% more company-owned stores as compared to year-end 1997. Part of this process is the taking and reconciling of physical inventories in stores. Party City expects to report its year-end financial results the week of March 28, 1999. The Company is approximately halfway through the inventory process, and, based on currently available information, has determined that inventory shrinkage levels and gross profit margins in company-owned stores are within the Company's historical range as well as its year-end budget. Also, based on preliminary results, total pre-tax operating expenses in the fourth quarter of 1998 were approximately $1 million higher than planned and, therefore, will have a corresponding effect on net income and earnings per share results."

*Weber* Complaint ¶ 43 (quoting 1 March 1999 Press Release).

### The 19 March 1999 Press Release—The Close of the Proposed Class Period

On 19 March 1999, prior to the opening of trading, Party City issued a press release over the PR Newswire (the "19 March 1999 Press Release") which stated:

"Party City Corporation (Nasdaq: PCTY) announced today that its year-end audit is continuing, but it is taking longer than expected due to various difficulties associated with implementing new and upgrading existing financial reporting and accounting systems that were required, in part, to accommodate the substantial growth of its business, as well as the time and difficulties associated with taking a physical inventory of the increased number of stores and recent turnover in its Finance Department. The Company is working diligently with its independent auditors to complete the audit as soon as possible. While the Company believed earlier this month that the audit would be completed by month end, at this time the Company does not expect that the audit will be completed by that date and is unable to indicate when the audit will be completed.

"The Company will be in default of certain reporting covenants under its existing $60 million secured credit facility as a result of the delay in completing the audit, and will be in default of certain financial covenants as of December 31, 1998. The Company is engaged in discussions with its lenders. In the event the Company is unable to resolve these issues with its lenders, the lenders may be able to exercise certain remedies, including acceleration of repayment.

"Steven Mandell Chairman and Chief Executive Officer of Party City, stated, 'We are extremely disappointed with the difficulties we have encountered in completing this year's audit and we have begun to take corrective action to avoid these issues in the future. Regarding communications with our investors, we intend to hold a conference call shortly after our annual results are released. We do not expect to

make further announcements concerning the year-end results until the audit is completed."

*Weber* Complaint at ¶ 45 (quoting 19 March 1999 Press Release).

The Proposed Class alleges investors were surprised by the announcement the year-end audit of Party City had been delayed indefinitely, and that Party City was in default of certain reporting covenants under its then existing $60 million secured credit facility. The Proposed Class further alleges investors were not aware Party City was in default of certain financial agreements as of 31 December 1998, and that the financial reporting and accounting systems of Party City were in disarray.

During the first day of trading following the 19 March 1999 Press Release, the price of Party City Stock fell $3 5/16 per share to $4 per share, representing a loss of more than 45%. The trading volume of Party City Stock was 6,667,000 shares, compared to an average daily volume of 176,909 shares.

The Proposed Class alleges Defendants disseminated materially false and misleading information concerning the financial condition and business prospects of Party City. The Proposed Class further alleges because the financial and accounting systems of Party City were in disarray, the financial results reported by Party City during the Proposed Class Period were materially inaccurate and overstated and failed to conform to the Generally Accepted Accounting Principals. The Proposed Class asserts the material misrepresentations and omissions of the Defendants regarding the operating results and financial condition of Party City caused Party City Stock to trade at artificially inflated prices during the Proposed Class Period.

*Discussion*

A. *The Private Securities Litigation Reform Act of 1995*

Congress enacted the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, (the "PSLRA") to remedy perceived abuses in the securities class action litigation. *See In re Milestone Scientific Sec. Litig.,* 183 F.R.D. 404, 411 (D.N.J.1998) ("*Milestone I* "); *In re Cendant Corp. Litig.,* 182 F.R.D. 144,

145 (D.N.J.1998); *In re Oxford Health Plans, Inc., Sec. Litig.,* 182 F.R.D. 42, 43 (S.D.N.Y.1998); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 404–05 (D.Minn. 1998); *Gluck v. Cellstar Corp.,* 976 F.Supp. 542, 543–44 (N.D.Tex.1997); *Lax v. First Merchants Acceptance Corp.,* 1997 WL 461036, at *2 (N.D.Ill. Aug. 11, 1997).

Prior to the enactment of the PSLRA, plaintiffs in securities fraud cases tended to profit irrespective of the culpability of the defendants, most of whom chose settlement over prolonged and expensive litigation. *See Milestone I,* 183 F.R.D. at 411; *Gluck,* 976 F.Supp. at 543–44. These cases were constantly subject to manipulation by lawyers and "professional plaintiffs," whose financial holdings in the defendant issuers were insignificant. *See* Conference Report on Securities Litigation Reform, H.R.Rep. No. 369, 104th Congress, 1st Sess. 31, *reprinted in* 1995 U.S.C.C.A.N. 679, 730–34 (the "Conference Report"). Often controlling the securities class actions, these plaintiffs and lawyers reaped huge profits, to the detriment of shareholders with more significant financial holdings. *See id.; see also Milestone I,* 183 F.R.D. at 411; *Cendant,* 182 F.R.D. at 145; *D'Hondt v. Digi Int'l Inc.,* 1997 WL 405668, at * 2 (D.Minn. Apr. 3, 1997).

The purpose behind the PSLRA is to " 'empower investors so that they, not their lawyers, control private securities litigation' by allowing the Court to ensure the transfer of 'primary control of private securities litigation from lawyers to investors.' " *See Chill,* 181 F.R.D. at 407 (quoting Conference Report at 683, 685); *Gluck,* 976 F.Supp. at 546.

Specifically, the PSLRA provides a method for identifying the plaintiff or plaintiffs who are the most strongly aligned with the class of shareholders, and most capable of controlling the selection and actions of counsel. *See* Conference Report at 371; *see also Fischler v. AmSouth Bancorp.,* 1997 WL 118429, at *1 (M.D.Fla. Feb. 6, 1997). In so providing, the PSLRA attempts to replace the outdated practice of selecting representative plaintiffs by a "race to the courthouse," with a selection system which focuses on the adequacy of the representative. *See* Conference Report

at 689; *see also Milestone I,* 183 F.R.D. at 412; *Cendant,* 182 F.R.D. at 145–46; *Ravens v. Iftikar,* 174 F.R.D. 651, 654 (N.D.Cal. 1997).[8]

The PSLRA added section 21D to the Exchange Act ("Section 21D"), as amended, 15 U.S.C. § 78u–4. Section 21D sets forth procedures for early notification to potential class members of the filing of the class action. Under section 21D(a)(3), a plaintiff seeking to represent a class:

Shall cause to be published in a widely-circulated national business-oriented publication or wire service, a notice advising members of the purported class—

(I) of the pendency of the action, the claims asserted therein, and the purported class period;

(II) *that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the Court to serve as lead plaintiff of the purported class.*

15 U.S.C. § 78u–4(a)(3)(A)(i) (emphasis added).

The PSLRA also altered the procedure by which the lead plaintiff for the purported class is appointed. As stated, pursuant to the PSLRA, the plaintiff who is "first to file" is no longer assured of the lead plaintiff position. Section 21D(a)(3)(B)(i) provides:

the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and *shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members* ...

15 U.S.C. § 78u–4(a)(3)(B)(i) (emphasis added).[9] In eschewing the "first come, first

serve" determination of the lead plaintiff in favor of the most adequate plaintiff, the PSLRA "ensure[s] that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers." *See In re Donnkenny Inc. Sec. Litig.,* 171 F.R.D. 156, 157 (S.D.N.Y.1997) (citing Conference Report at 730–34).

The selection of the most adequate plaintiff under the PSLRA is governed by a rebuttable presumption:

[T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirement of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

This presumption of adequacy

*may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—*

(aa) will not fairly and adequately protect the interest of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(II) (emphasis added).

The PSLRA further provides that once the most adequate plaintiff is selected, the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel

---

**8.** The PSLRA did not completely eliminate the "race to the courthouse," however. For example, plaintiffs who are first to file suit are obligated to provide notice to other purported class members of the asserted claims and the purported class period. *See* 15 U.S.C. § 78u–4(a)(3)(A). Such plaintiffs are in a better position to aggregate other potential plaintiffs in an attempt to

assemble the largest financial interest in the litigation.

**9.** A decision on a motion to appoint a lead plaintiff should be made as soon as is practicable after the consolidation of class actions asserting substantially the same claim or claims. *See* 15 U.S.C. § 78u–4(a)(3)(B)(ii).

to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v).

### B. Appointment of Lead Plaintiffs

#### 1. The Notification Requirement

In the instant case, the notification requirement has been met. The *Weber* Action was the initial action filed. Pursuant to Section 21D(a)(3)(A)(i), the plaintiff in the *Weber* Action published the notice of pendency of the instant action (the "Notice of Pendency") in a widely-circulated national business-oriented wire service, the *PR Newswire*.[10] *See* Notice of Pendency, attached to Egan Aff. as Exh. B. The Notice of Pendency adequately apprised members of the Proposed Class of their right to move the Court to serve as lead plaintiff or plaintiffs no later than sixty days from the date of publication. *See id.* In response to the Notice of Pendency, the Proposed Lead Plaintiffs filed the pending Lead Plaintiffs Motion, as required under Section 21D(a)(3)(B)(II)(aa).

A motion for the appointment of lead plaintiff must be filed within sixty days of the publication of the Notice of Pendency. *See* 15 U.S.C. § 78u–4(a)(3)(A)(i). There is no dispute as to the timeliness of the Lead Plaintiffs Motion made in response to the Notice of Pendency. The Notice of Pendency was published on 22 March 1999. *See* Notice of Pendency. The Lead Plaintiffs Motion was filed on 21 May 1999. Accordingly, the Lead Plaintiffs Motion was timely filed.

#### 2. The Largest Financial Interest Requirement

■ It appears Proposed Lead Plaintiffs, as a group, represent the largest financial interest of any class member or group of class members. As discussed, a presumption of adequacy arises where the "group of persons" having the largest financial interest among the named plaintiffs in the class action seeks appointment as lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb). The PSLRA does not define "largest financial interest" or provide guidance as to how such a determination is made. One District Court has found four factors "surely relevant" to this inquiry:

> (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs.

*First Merchants Acceptance Corp.*, 1997 WL 461036, at *5; *see also In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 295 (E.D.N.Y. 1998) (recognizing same four factors).

During the Proposed Class Period, the Proposed Lead Plaintiffs purchased 139,000 shares of Party City Stock. *See* Certifications of Proposed Lead Plaintiffs, Attached to Egan Aff. as Exh. C. Collectively, the Proposed Lead Plaintiffs estimate their losses as a result of the securities violations alleged in the instant action as $1,910,221. *See* Egan Aff. at Exh. A (calculating estimated damages based upon the difference between the purchase price and sale price, or upon the number of shares held at the close of the Proposed Class Period multiplied by the mean trading value of Party City Common Stock from the close of the Proposed Class Period to 5 May 1999).[11] Proposed Lead Plaintiffs collectively assert they "clear-

---

**10.** The PSLRA does not define "widely-circulated" or "wire service." *See* 15 U.S.C. § 78u–4(a)(3)(A)(i). Congress, however, intended publication to "encompass a variety of mediums [sic], including wire, electronic, or computer services." *See* Conference Report at 733; *see also Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 62 (D.Mass.1996). The *PR Newswire* appears to be a business-oriented wire service within the meaning of the PSLRA. *See, e.g., Greebel*, 939 F.Supp. at 62; *First Merchants Acceptance Corp.*, 1997 WL 461036, at *4 ("[T]he court must make its own interpretation as to what the term ['widely-circulated'] means."); *Lax v. First Merchants*

Acceptance Corp., 1997 WL 461036 at *1, 1997 U.S.Dist. LEXIS 11866 at *2 (N.D.Ill. Aug. 6 1997).

**11.** The estimated damages value is included herein to demonstrate the potential financial interest of the Proposed Lead Plaintiffs in the instant action. The inclusion of this value does not preclude a later challenge to the appropriateness of this value or its method of calculation. Indeed, it does not appear this estimate of damages considered whether other independent, intervening forces affected the market value of Party City Stock during the Proposed Class Period.

ly have the largest financial interest of any shareholder or group of shareholders of Party City Stock." *See* Moving Brief at 15. From review of the submissions of the Proposed Lead Plaintiffs, it appears the Proposed Lead Plaintiffs have the largest financial interest in the instant litigation.

### 3. *Rule 23 Requirements*

■ The PSLRA requires the Proposed Lead Plaintiffs demonstrate they "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure [("Rule 23")]." *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc); *see also Chill,* 181 F.R.D. at 408 ("Ultimately, the PSLRA channels the concern, as to the adequacy of representation, through Rule 23."). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defense of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

■ "A wide-ranging analysis under Rule 23 is not appropriate [at this initial stage of the litigation] and should be left for consideration of a motion for class certification." *Fischler,* 1997 WL 118429, at *2; *see also Gluck,* 976 F.Supp. at 546 ("Evidence regarding the requirements of Rule 23 will of course, be heard in full at the class certifica-

tion hearing. There is no need to require anything more than a preliminary showing at this stage.").

■ Accordingly, "discovery regarding the[ ] elements [of Rule 23] is only allowe[d] if another purported member of the class can demonstrate a reasonable basis for finding the presumptively most adequate plaintiff incapable of adequately representing the class." *See Gluck,* 976 F.Supp. at 546 (citing 15 U.S.C. § 78u–4(a)(3)(B)(iv)). In the instant case, the Lead Plaintiffs Motion is unopposed.

■ A preliminary, fact-specific inquiry is nonetheless necessary under Rule 23 to determine whether the presumptively most adequate plaintiff will nevertheless betray the interests of the class. *See Milestone I,* 183 F.R.D. at 414; *Chill,* 181 F.R.D. at 408; *see also In re Ford Motor Co. Bronco II Product Liability Litig.,* 177 F.R.D. 360, 367 (E.D.La. 1997). This inquiry "focus[es] on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4), that is typicality and adequacy." *Gluck,* 976 F.Supp. at 546.[12]

The Proposed Lead Plaintiffs have sufficiently demonstrated, at this preliminary stage, the requisite typicality. The typicality requirement under Rule 23(a)(3)

> permits the court to assess whether the class representatives themselves present those common issues of law and fact that justify class treatment, thereby tending to assure that the absent class members will be adequately represented.

*Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985); *see also General Telephone Co. of*

---

**12.** Generally, a defendant or defendants may not object to the adequacy or typicality of the proposed lead plaintiff at this preliminary stage of the litigation. *See Gluck,* 976 F.Supp. at 550 ("Defendants have no standing to oppose the appointment of Lead Plaintiff at this stage of the litigation."); *see also Zuckerman,* 1997 WL 314422, at *2; *Greebel,* 939 F.Supp. at 60–61. "The statute is clear that only potential plaintiffs may be heard regarding appointment of a Lead Plaintiff." *Gluck,* 976 F.Supp. at 550. The PSLRA specifically provides "the court shall consider *any motion made by a purported class member"* in determining the adequacy of a proposed lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(i) (emphasis added); *see also* 15 U.S.C. § 78u–

4(a)(3)(B)(iii)(II) ("The presumption described in 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I) may be rebutted only upon "proof by *a member of the purported plaintiff class . . . . "*) (emphasis added).

The determination, however, that some or all of the Proposed Lead Plaintiffs meet the requirements of Rule 23 does not preclude the possibility of revisiting the issue at the class certification stage. The opportunity for Party City and/or the Individual Defendants to contest class certification on these grounds is preserved. *See Zuckerman,* 1997 WL 314422, at *2; *Gluck,* 976 F.Supp. at 547 (quoting *Greebel,* 939 F.Supp. at 60–61;) *In re Cephalon Sec. Litig.,* 1996 WL 515203 (E.D.Pa. Aug. 27, 1996).

*Southwest v. Falcon,* 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 311 (3d Cir.1998); *Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994). This requirement helps ensure alignment of the interests of the Proposed Class with those of the class representatives "so that the [class representatives] will work to benefit the entire class through the pursuit of their own goals." [13] *In re Prudential,* 148 F.3d at 311; *see also Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 631 (3d Cir. 1996), *aff'd, Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Baby Neal,* 43 F.3d at 57.

Rule 23(a)(3) does not require the claims of the Proposed Lead Plaintiffs be identical to those of the class. *See In re Prudential,* 148 F.3d at 311; *Eisenberg,* 766 F.2d at 786; *Weiss v. York Hospital,* 745 F.2d 786, 809 (3d Cir.1984). Rather, the typicality requirement is satisfied when the "plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *See Baby Neal,* 43 F.3d at 58; *Eisenberg,* 766 F.2d at 786. The typicality requirement is not met, however, where the " 'plaintiff's factual or legal stance is not characteristic of that of other class members.' " *Gunter v. Ridgewood Energy Corp.,* 164 F.R.D. 391, 395 (D.N.J.1996) (quoting *Weiss,* 745 F.2d at 808).

It appears the legal claims of the Proposed Lead Plaintiffs are typical of the Proposed Class. The Proposed Lead Plaintiffs assert the typicality requirement has been met because the Proposed Lead Plaintiffs and the absent members of the Proposed Class have similar legal claims arising out of the alleged false statements of the Defendants.[14] *See* Moving Brief at 18–19; *see also In re Prudential,* 148 F.3d at 311; *Baby Neal,* 43 F.3d at 56; *Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912, 923 (3d Cir.1992) (quoting *Grasty v. Amalgamated Clothing & Textile Workers Union,* 828 F.2d 123 (3d Cir.), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988)) (" 'factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members.' ").

The *Catanzarite* and *Weber* Complaints contain allegations and a recitation of facts which are similar, if not identical, to the other class action complaints filed against the Defendants before the consolidation of this matter. The legal claims and legal theories of the Proposed Lead Plaintiffs are not so "markedly different" from those of other class members, so as to render them atypical. *See Eisenberg,* 766 F.2d at 786 (citing *Weiss,* 745 F.2d at 809 n. 36).

Unlike the typicality requirement of Rule 23, however, the adequacy of representation requirement presents an inquiry that reaches beyond the factual allegations and legal theories of a complaint to determine if an individual plaintiff may have interests in conflict with the absent class members. As explained below, the finding that claims of the Proposed Lead Plaintiffs are typical of those of the Proposed Class does not, standing alone, ensure the interests of the Proposed Lead Plaintiffs are sufficiently aligned with the Proposed Class. Forces independent of the common core of facts from which

13. As discussed below, the typicality requirement of Rule 23 is satisfied if the claims of the proposed class representative arise from the same event or course of conduct that gave rise to the claims of the other class members and are premised upon the same legal theory. The presence of a common core of operative facts and the assertion of similar legal theories, will not, however, guarantee the alignment of interests between the Proposed Class and the Proposed Lead Plaintiffs. Other factors, independent of the facts forming the basis of the cause of action, may work to create conflicting interests among the various members of the Proposed Class and those seeking appointment as lead plaintiffs.

14. Proposed Lead Plaintiffs also contend they " 'suffered losses similar to other class members' and 'their losses allegedly result from the defendant's common course of conduct.' " Moving Brief at 19 (quoting *Milestone I,* 183 F.R.D. at 415). As explained later in this opinion, however, such a contention may not be accurate. In fact, it appears there is a conflict among the members of the Proposed Class at least with respect to loss recovery from Party City.

this matter arose may work to create an internal class conflict.

In this Circuit, the adequacy of a class representative depends upon the following two factors:

(1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to the class.

*Weiss,* 745 F.2d at 811; *see also In re Prudential,* 148 F.3d at 312; *Georgine,* 83 F.3d at 630; *In re General Motors Corp.,* 55 F.3d 768, 800 (3d Cir.1995); *Hoxworth,* 980 F.2d at 923.

Adequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests among the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action. *See Milestone I,* 183 F.R.D. at 416. The adequacy of representation inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products,* 521 U.S. at 625, 117 S.Ct. 2231.

In the instant matter, there appears to be a conflict of interest between the Krasnow/Slater Asset plaintiffs and Taylor Capital. This conflict arises from the fact Krasnow and Slater Asset maintain an equity interest in Party City while Taylor Capital retains no such interest.

There appears to be an inherent, and fundamental, conflict in securities class actions, between plaintiffs who continue to hold an equity interest in the defendant corporation (the "Retention Plaintiffs") and those plaintiffs who sold all of their interest in the defendant corporation (the "In/out Plaintiffs") (the "Retention/Seller Conflict").[15] The Retention Plaintiffs, in effect, are suing themselves. They seek recovery for their individual losses while maintaining a financial interest in the continued commercial viability and financial success of the defen-

dant corporation. The In/out Plaintiffs, however, have no ongoing interest in either the continued commercial viability or financial success of the defendant corporation. The In/out Plaintiffs have one focus: maximizing their recovery from the defendant corporation.

The interest of Retention Plaintiffs in a defendant corporation, as a going concern, will likely create interests that are antithetical to the interests of the In/out Plaintiffs. The personal financial interests of a particular Retention Plaintiff may, in a given instance, outweigh his or her equity interests in the defendant corporation. This possibility, however, does not appear to minimize the potential for intra-class conflict between Retention Plaintiffs and In/out Plaintiffs. Nor does it appear the ability of a Retention Plaintiff to opt out of a class action eliminates the potential for conflict.

The Retention/Seller Conflict is heightened when a Retention Plaintiff seeks appointment as lead plaintiff in a class action encompassing In/out Plaintiffs, and vice versa. As mentioned, the Retention Plaintiff is, in effect, indirectly suing his or herself. The fact an individual Retention Plaintiff may have a greater interest in recovering personal losses than in the overall welfare of the defendant corporation only serves to explain his or her personal involvement in the class action. Although an individual Retention Plaintiff may prefer his or her private interests over the interests of the defendant corporation, it does not follow a Retention Plaintiff would be agreeable to hundreds, or thousands, of other class plaintiffs also receiving damage awards at the expense of a corporation in which the Retention Plaintiff maintains an equity interest. Further, the concern is not whether a Retention Plaintiff would have the ability to opt out of a particular class action, but rather once a Retention Plaintiff decides to join in a class action, will that Retention Plaintiff work against those class members who no longer hold equity interests.[16]

The In/out Plaintiff, on the other hand, is not constrained by an equity interest in the

---

15. In addition to the Retention Seller Conflict, see *In re Seagate II Technology Sec. Litig.,* 843 F.Supp. 1341, 1362–64 (N.D.Cal.1994) for a discussion of other conflict scenarios.

16. The consequences of the Retention/Seller Conflict may be difficult to discern over the course of a given litigation. The conflicting interests of Retention Plaintiffs and In/out Plaintiffs may lead

defendant corporation. The continued commercial viability and financial success of the defendant corporation will not serve as a check on the efforts of the In/out Plaintiff to obtain damages from the defendant corporation.

The Retention/Seller Conflict becomes more acute when a Retention Plaintiff can expect to lose more money as a shareholder who shoulders the burden of a settlement or adverse judgment than he or she can be expected to gain from a settlement or litigation. For example, if a Retention Plaintiff purchased stock both before and during the alleged class period, only those shares purchased during the class period would be included in any resulting settlement or judgment. Such a Retention Plaintiff may not be well served by the litigation process.

The Retention/Seller Conflict may result from the transfer of wealth from the Retention Plaintiffs to the In/out Plaintiffs. Any settlement or judgment paid by a defendant corporation to a class would have the effect of reducing the value of the equity interest of the Retention Plaintiffs in the defendant corporation to the benefit of the In/out Plaintiffs.[17] Accordingly, a question arises as to whether a lead plaintiff who is a Retention Plaintiff would adequately represent the interests of an In/out Plaintiff during settlement negotiations. A large settlement could drive down the market price, or value, of the shares of the defendant corporation. Every dollar that would be expended or paid out by the defendant corporation to settle a case, pay a judgment or pay attorneys' fees would be one less dollar available for the ongoing management and operation of the defendant corporation.[18]

As evident from the constitution of the group of Proposed Lead Plaintiffs, both Re-

---

to subtle manifestations with significant impact upon members of the represented class. Were Retention Plaintiffs and In/out Plaintiffs allowed to serve together as lead plaintiffs, or represent a class containing both Retention Plaintiffs and In/out Plaintiffs, their conflicting interests may impede the efficient progress of the litigation. In addition, a Retention Plaintiff, concerned with the commercial viability and financial success of the defendant corporation may push for swift settlement of the pending litigation at a lower dollar amount.

An In/out Plaintiff, on the other hand, may prefer to see the litigation go forward in the hopes of achieving a larger judgment and may pursue a settlement at a much higher dollar amount. Pursuant to either scenario, members of the represented class would find that either their equity interest or damages recovery had been undermined and that their interests in the litigation had not been adequately represented by those appointed as lead plaintiffs. Given the difficulty of monitoring the effects the Retention/Seller Conflict may have in any given litigation, it is important to establish boundaries and guidelines at the commencement of the litigation to lessen the impact of the Retention/Seller Conflict.

17. The value of the defendant corporation may be diminished regardless of whether the settlement or judgment is partially or wholly covered by insurance. To the extent damages relating to the litigation are covered by insurance, payment of the covered losses by the insurance company would likely result in higher future insurance premiums for the defendant corporation. Accordingly, the defendant corporation will pay for the settlement or judgment to the extent such payments are not covered by insurance and by higher future insurance premiums. Regardless of how it is examined, the defendant corporation will pay and thereby be diminished in value.

18. Accordingly, several factors may be weighed by a Retention Plaintiff in determining how to prosecute an action under the Federal securities laws. A retention plaintiff must balance the value of the future economic success of the defendant corporation with the value of a settlement or judgment of the class action in which he or she is participating. Should it appear that the greater financial gain for the Retention Plaintiff may be obtained by tempering recovery in the class action, thereby creating a stronger economic foundation for the defendant corporation, then the Retention Plaintiff may likely to forego full recovery in the class action. The Retention Plaintiff would be compensated for this decision, however, by the economic gains the defendant corporation might achieve as a result of having paid out a tempered settlement of judgment. No such benefit would accrue to the In/out Plaintiffs.

The In/out Plaintiffs, lacking any continued financial interest in the defendant corporation, will only be motivated to seek the maximum possible recovery. The In/out Plaintiffs will not be motivated by concern for the future of the defendant corporation so long as it appears the defendant corporation has the ability to pay a settlement or judgment. Accordingly, the In/out Plaintiffs may seek a settlement or judgment that may significantly undermine both the commercial viability and financial success of the defendant corporation and the equity interests of the Retention Plaintiffs.

tention Plaintiffs and In/out Plaintiffs are likely to join in securities class actions. This creates the potential for conflict both among the Proposed Lead Plaintiffs and among the Proposed Lead Plaintiffs and members of the Proposed Class. The source of the Retention/Seller Conflict is the equity self-interest of the Retention Plaintiffs, an interest which the In/out Plaintiffs do not have.[19]

Similarly, the only incentive of In/out Plaintiffs is to strive for the maximum recovery to compensate for their alleged losses, regardless of the resulting impact on the defendant corporation. Clearly, the In/out Plaintiffs no longer have a vested interest in the viability of the defendant corporation. Accordingly, the In/out Plaintiffs are not motivated to temper their recovery, or the recovery of others, based upon the effect an award of damages would have on the defendant corporation.

As mentioned, the PSLRA provides a method for identifying the plaintiff or plaintiffs who are the most strongly aligned with the class of shareholders, and most capable of controlling the selection of counsel. A successful applicant for the position of lead plaintiff must demonstrate he or she is capable of fairly and adequately representing the class.

The Retention/Seller Conflict could work to undermine the goals of the PSLRA if both Retention Plaintiffs and In/out Plaintiffs were appointed as lead plaintiffs. The Retention/Seller Conflict may lead to the pursuit of different, and contrary, litigation goals by lead Retention Plaintiffs and lead In/out Plaintiffs. The pursuit of contrary goals would likely hinder the ability of a lead plaintiff group to form a cohesive unit with the

ability to control the actions of counsel or to efficiently and effectively prosecute the class action. Further, the Retention/Seller Conflict may prevent Retention Plaintiffs and In/out Plaintiffs from adequately representing the interest of those members of the class who are not similarly situated to them. Accordingly, the appointment of a group of lead plaintiffs consisting of both Retention Plaintiffs and In/out Plaintiffs runs contrary to the goals of the PSLRA.[20]

In the instant matter, Taylor Capital no longer holds an equity interest in Party City, even though Taylor Capital purchased 37,500 shares during the Proposed Class Period. By selling its interest in Party City, Taylor Capital expressed its belief there is no financial gain to be had by a continued equity position in Party City.

Krasnow, the individual investor, appears to still hold all 42,000 shares of Party City Stock he purchased during the Proposed Class Period. Slater Asset apparently still retains 38,500 of the 59,500 shares it purchased during the Proposed Class Period. Accordingly, Slater Asset still maintains a considerable equity interest in Party City and would appear to have ownership interests similar to Krasnow, even though Slater Asset sold some 21,000 shares during the Proposed Class Period.

The ownership interests of Krasnow and Slater Asset, as Retention Plaintiffs, may conflict with the interests of Taylor Capital as an In/out Plaintiff. Taylor Capital will likely seek to maximize its recovery without concern for the continued commercial viability and financial success of Party City. Krasnow and Slater Asset, however, given their

**19.** The conflict between Retention Plaintiffs and In/out purchasers also may create a conflict of interest for counsel to the class. Counsel for a class containing both Retention Plaintiffs and In/out Plaintiffs could be faced with an irreconcilable conflict. In seeking the maximum recovery for In/out Plaintiffs, counsel for the class may well undermine the commercial viability and financial success of the defendant corporation, thus acting contrary to the interest of its Retention Plaintiff clients. In working to protect the equity interests of the Retention Plaintiffs, class counsel could not diligently pursue maximum recovery for the In/out Plaintiffs. Accordingly, it does not appear a Retention Plaintiff, or counsel

for a Retention Plaintiff, could adequately represent a class containing In/out Plaintiffs. Nor could an In/out Plaintiff, or counsel for an In/out Plaintiff, adequately represent a class containing Retention Plaintiffs.

**20.** It is recognized that during the course of litigation a Retention Plaintiff could sell his or her interest in the defendant corporation and become an In/out Plaintiff. Such a situation would need to be addressed when, and if, it were presented. In addressing the Motion for Lead Plaintiffs, consideration can only be given to the facts that have been presented.

equity interest in Party City, would presumably want Party City to continue as a healthy going concern after the conclusion of the instant litigation. Given the fundamental nature of the Retention/Seller conflict, it appears likely Retention Plaintiffs and In/out Plaintiffs would have divergent interests during the course of settlement negotiations and throughout the litigation process. Further, it appears the Retention/Seller Conflict would prevent counsel from providing adequate representation to parties with the discussed opposing interests. Accordingly the interests of Krasnow and Slater Asset on the one hand, and Taylor Capital on the other, are not sufficiently aligned to allow for the appointment of all three as lead plaintiffs in the instant action.

The interests of Krasnow and Slater Asset may well be antithetical to the interests of Taylor Capital and other In/out Plaintiffs in the Proposed Class. It appears, the Retention/Seller Conflict renders Krasnow and Slater Asset inadequate representatives for a class containing In/out Plaintiffs; as well, Taylor Capital appears to be an inadequate representative for a class containing Retention Plaintiffs.

Accordingly, only Krasnow and Slater Asset are approved as lead plaintiffs.[21] Krasnow, an individual investor, and Slater Asset, an institutional investor, have a large financial interest in the instant litigation. Further, it appears the interests of Krasnow and Slater Asset are sufficiently aligned to allow them to adequately and vigorously prosecute the instant action. In addition, review of the firm resumes of Co-counsel for the Proposed Lead Plaintiffs (the "Proposed Co-counsel") demonstrates Proposed Co-counsel are qualified, experienced and able[22] to conduct this litigation in a professional manner. See Proposed Co-counsel Firm Resumes, attached to Egan Aff. as Exh. E.

Taylor Capital is not approved as a lead plaintiff in the instant action. The conflict of interests that may arise between Retention Plaintiffs and In/out Plaintiffs prevents the approval of a group of lead plaintiffs consisting of some members that are Retention Plaintiffs and other members that are In/out Plaintiffs. The existence of such a conflict could lead to disputes among the Proposed Lead Plaintiffs that could delay, or otherwise hinder, the prosecution of the instant matter and prejudice the absent class members.

As discussed, the Proposed Class contains members who are Retention Plaintiffs and members who are In/out Plaintiffs. At this stage, Krasnow and Slater Asset are appointed as lead plaintiffs to represent the Proposed Class, as defined by Movants. Because a decision on a motion for the appointment of lead plaintiffs does not allow for a determination on the merits of class certification, the propriety of Krasnow and Slater Asset serving as class representative for a

21. Krasnow and Slater are selected as lead plaintiffs because their alleged financial interest in the instant litigation, both individually and combined, is greater than the financial interest of Taylor Capital. The Retention/Seller Conflict required a choice be made between appointing only Retention Plaintiffs or only In/out Plaintiffs as lead plaintiffs in the instant cation. The appointment of Krasnow and Slater Asset was made in light of the presumption in favor of appointing plaintiffs with the largest financial interest in the relief sought by the class. See, e.g., 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb). As explained, however, this decision does not preclude Taylor Capital from either remaining in the instant action as a member of the Proposed Class or later seeking appointment as lead plaintiff in a new action should the In/out Plaintiffs opt to file such an action in accordance with this opinion.

The appointment of Krasnow and Slater Asset as lead plaintiffs represents a determination made at the preliminary stages of the instant litigation. A decision on the appointment of lead plaintiffs should not be construed as a final ruling on the propriety of either Krasnow or Slater Asset serving a class representatives. Given the fundamental nature of the Retention/Seller Conflict, Krasnow and Slater Asset are obligated to inform the Court of any change in their status as Retention Plaintiffs. Any such change, and its impact upon the instant case, may be addressed at the time of class certification. Changes in the status of either Krasnow or Slater Asset as Retention Plaintiffs occurring after class certification will be addressed as part of the continuing management obligation of the court. See, e.g., General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (noting court has ability to modify or vacate an order of class certification should it prove necessary during the course of litigation).

22. The qualifications of Proposed Co-counsel are discussed in greater detail below in relation to the Lead Counsel Motion.

class containing both Retention Plaintiffs and In/out plaintiffs should be addressed at the time a motion for class certification is submitted.

In light of the Retention/Seller Conflict, however, the In/out Plaintiff members of the Proposed Class are given leave to commence a new action, should they so choose, to be filed with this Court and assigned to the undersigned, seeking recovery for the alleged fraudulent inflation of the price of Party City Stock during the Proposed Class Period. An appropriate motion for the appointment of lead plaintiff and selection of lead counsel in such newly filed action will be addressed following the commencement of such action.[23] Should any, or all, of the In/out Plaintiff members of the Proposed Class choose to remain in this action, the effect of the Retention/Seller Conflict on the ability of Krasnow and Slater Asset to fairly and adequately represent a class containing both Retention Plaintiffs and In/out Plaintiffs will be addressed at the time a motion is made for class certification.

### 4. *Presumption Not Rebutted*

Other than as explained, the presumption of adequacy has not been rebutted as to Krasnow and Slater Asset. As observed, the presumption may be overcome by showing the Proposed Lead Plaintiffs will not "fairly and adequately protect the interest of the [C]lass," or are "subject to unique defenses that render [the Proposed Lead Plaintiffs] incapable of adequately representing the [Proposed] Class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

As discussed, the adequacy of Krasnow and Slater Asset has not been challenged by any member of the Proposed Class. Absent such a challenge, the presumption of adequacy will generally survive. *See Zuckerman,* 1997 WL 314422, at *2 (where "[n]o purported class member has presented evidence to rebut this presumption, . . . the Court will appoint the movants as lead plaintiffs");

*D'Hondt,* 1997 WL 405668, at *4 (in delegating the rebuttal of the presumption to members of the putative class, "Congress placed the principal responsibility, for investigating the propriety of any proposed Lead Plaintiff, to the purported class members"); *Gluck,* 976 F.Supp. at 547.

### 5. *Propriety of Multiple Lead Plaintiffs*

The fact that a group, as opposed to a single individual, is proposed as lead plaintiff does not necessarily render the Proposed Lead Plaintiffs inadequate. The PSLRA expressly provides a "group of plaintiffs" may be deemed most adequate plaintiffs. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). It has also been held that the appointment of more than one lead plaintiff does not violate the PSLRA. *See Oxford,* 182 F.R.D. at 48–49; *In re Cephalon,* 1996 WL 515203, at *1 (E.D.Pa. Aug. 27, 1996).

While the PSLRA does not limit the number of proposed lead plaintiffs, a "rule of reason prevails." *See Chill,* 181 F.R.D. at 409.

> The assertion can legitimately be made that the larger the number of proposed Lead Plaintiffs, the greater the dilution of the control that those Plaintiffs can maintain over the conduct of the putative class action . . . .

*D'Hondt,* 1997 WL 405668, at *3. The inevitable dilution of control stemming from the appointment of multiple lead plaintiffs may result in weakened bargaining power of the lead plaintiffs. In particular, multiple lead plaintiffs may be hampered in their collective ability to effectively negotiate retention agreements and supervise the conduct of counsel. *See Cendant,* 182 F.R.D. at 148 ("[R]epresentation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation."). In this regard, the appointment of multiple lead plaintiffs may

---

**23.** The litigation of the instant action and the newly filed action, if so filed, will be closely coordinated to prevent the unnecessary duplication of costs, expenses and effort. It appears any solution to the Retention/Seller Conflict will re-

sult in additional litigation costs. These costs, however, are unavoidable; there is no other means of avoiding the Retention/Seller Conflict or of assuring adequate representation by lead plaintiffs or counsel.

detract from the [PSLRA's] fundamental goal of client control, as it would inevitably delegate more control and responsibility to the lawyers for the class and make the class representative more reliant on the lawyers.

*Gluck,* 976 F.Supp. at 549–50; *see Steiner v. Frankino,* No. 1:98 CV 0264, slip op. at 12 (N.D.Ohio 16 July 1998); *Donnkenny,* 171 F.R.D. at 157–58.

One court, in appointing co-lead plaintiffs, reasoned that multiple lead plaintiffs allow for "diverse representation." *See Oxford,* 182 F.R.D. at 49. Diverse representation is, however, an insufficient rationale justifying the appointment of multiple lead plaintiffs. *See Cendant,* 182 F.R.D. at 148 (rejecting "the argument that additional plaintiffs bring to the litigation other counsel capable of advancing additional funds" as a basis for appointing multiple lead plaintiffs). Focusing on considerations such as diverse representation and additional financing overlooks the fundamental goal of the PSLRA—the empowerment of a unified force to control the litigation. *See* Conference Report at 683, 685; *Gluck,* 976 F.Supp. at 549–50.

Where multiple lead plaintiffs have divergent interests, the leadership of a class may be divided, and rendered factious. While the PSLRA refers to "a person or group of persons" as being capable of serving as the lead plaintiff, the surrounding statutory language forecloses the appointment of multiple groups or multiple persons not part of a cohesive group. Significantly, apart from the sole reference to a "group of persons," the PSLRA is worded in the singular, providing a mechanism for the appointment of "the most adequate *plaintiff,*" not the most adequate plaintiffs. *See* 15 U.S.C. § 78u–4(a)(3)(B)(i) and (iii).

When considering the Lead Plaintiffs Motion, the policies behind the PSLRA must be recognized. The composition of the Proposed Lead Plaintiffs must be scrutinized carefully. *See, e.g., In re Nice Systems, Ltd. Sec. Litig.,* 188 F.R.D. 206, 222–23 (D.N.J. 1999).

In *Nice Systems,* a group of nine individuals sought appointment as lead plaintiffs. *See id.,* 188 F.R.D. at 222–23. The financial interest of four of those nine individuals was found to be disproportionately small when compared to the financial interests of the remaining members of the proposed lead plaintiff group. *See id.* 188 F.R.D. at 222–24 (noting that none of the four individuals had greater than a 3¼% interest in the value of the shares purchased by the proposed lead plaintiff group). Concern was expressed that those four individuals could cause a division in the authority of the proposed lead plaintiff group or otherwise dilute control of the class action litigation. *See id.* 188 F.R.D. at 222–23.

In *Nice Systems,* it was determined the relatively small financial interest of the four individuals in the *Nice Systems* litigation distinguished their interest from those of the remaining members of the proposed lead plaintiffs group. *See Nice Systems,* 188 F.R.D. at 223–24. The appointment of proposed lead plaintiffs whose interest in the litigation could diverge from the interests of the absent class members and other members of the proposed lead plaintiffs group was determined to be contrary to the goal of appointing a lead plaintiff that was " '*most* capable of representing the interests of the class members.' " *See id.* (quoting 15 U.S.C. § 78u(a)(3)(B)(i)) (emphasis in opinion). Accordingly, only the five individuals with the greatest financial interest in the *Nice Systems* litigation were appointed as lead plaintiffs. *See id.* 188 F.R.D. at 223–24.

In the instant action, the concerns expressed in *Nice Systems,* related to the appointment of lead plaintiffs with only a minor financial interest in the outcome of the litigation, are not present. Each of the Proposed Lead appears to have a substantial financial interest in the instant litigation. As mentioned, however, Krasnow and Slater Asset, as Retention Plaintiffs, are likely to have interests that will conflict with the interests of Taylor Asset and other members of the Proposed Class who are In/out Plaintiffs. Given the possibility of conflict among Proposed Lead Plaintiffs, it would be improper to appoint Krasnow and Slater Asset, togeth-

er with Taylor Capital, as lead plaintiffs. *See Nice Systems,* 188 F.R.D. at 223–24. As stated, only Krasnow and Slater Asset are appointed as lead plaintiffs in the instant action.

Where the interests of proposed lead plaintiffs are aligned, concerns regarding the division of authority and dilution of control are not paramount. The appointment of Krasnow and Slater Asset as lead plaintiffs, and the exclusion of Taylor Capital, should provide the desired alignment of interests. It appears Krasnow and Slater Asset have a similar stake in the instant litigation. In the instant case, it appears Krasnow and Slater Asset will be able to serve the same statutory purpose as a "person"—Krasnow and Slater Asset, by virtue of their financial interest in the instant litigation and the fact they are both Retention Plaintiffs, should provide a cohesive unit capable of unified decision-making.

Moreover, Krasnow, as a lead plaintiff, will be able to benefit from the investment experience of Slater Asset, as an institutional investor. The substantial financial interest of Krasnow and Slater Asset, combined with the institutional experience of Slater Asset, should enable Krasnow and Slater Asset to withstand any possible usurpation of control by counsel. The appointment of Krasnow and Slater Asset appears to meet one of the goals of the PSLRA—the appointment of both institutional investors, such as Slater Asset, and individual investors with large financial interests, such as Krasnow, to serve as lead plaintiffs in securities class actions. Accordingly, the Lead Plaintiffs Motion is granted to the extent it sought the appointment of Krasnow and Slater Asset. The Lead Plaintiffs Motion is denied to the extent it sought the appointment of Taylor Asset.

C. *Appointment of Lead Counsel*

■ The approval of lead counsel pursuant to Section 21D(a)(3)(B)(v) is not governed by the same statutory guidelines which control the lead plaintiff determination. *See In re Milestone Scientific Sec. Litig.,* 187 F.R.D. 165, 176 (D.N.J.1999) ("*Milestone II* "); *Cendant,* 182 F.R.D. at 149 (stating lead plaintiff does not come "inextricably tied

to its counsel"). The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the District Court. *See id.* The legislative history of the PSLRA reveals that Congress wished to encourage the exercise of discretion in approving the selection of lead counsel.

> [Congress] does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

Conference Report at 685. The exercise of such discretion necessitates an inquiry into the appropriateness of the appointment of more than one law firm; the nature and extent of such inquiry may vary from case to case. *See Milestone II,* 187 F.R.D. 165, 174–76.

■ The judgment of a lead plaintiff or proposed lead counsel is not dispositive in the appointment of lead counsel. Approval of lead counsel necessarily requires an independent evaluation of, among other considerations, the effectiveness of proposed class counsel to ensure the protection of the class. *See Milestone II,* 187 F.R.D. 165, 176. As well, a court must be mindful that the lead plaintiff has significant responsibilities and duties, including the management of the direction of the case. *See id.* Disputes concerning the direction of the case should be resolved by the lead plaintiffs, here Krasnow and Slater Asset. This task can be complicated, or even thwarted, by pressure or impute from several lead counsel. *See id.*

The PSLRA, however, does not expressly prohibit the lead plaintiff from selecting more than one law firm to represent the class. *See* 15 U.S.C. § 78u–4(a)(3); *see also Oxford,* 182 F.R.D. at 50; *Zuckerman v. Foxmeyer Health Corp.,* 1997 WL 314422, at *2 (N.D.Tex. 28 Mar. 1997). In certain situations, the appointment of multiple lead counsel may better protect the interests of the plaintiff class. Where a single firm lacks the resources or expertise to prosecute an action, for example, the approval of multiple lead counsel may expedite litigation. *See Oxford,* 182 F.R.D. at 49 (where proposed law firms were small and litigation was potentially "costly and time-consuming," the "sharing of

resources and experience" would ensure a more expeditious resolution of the action); *In re Wells Fargo Sec. Litig.*, 156 F.R.D. 223, 226 (N.D.Cal.1994) ("[The] plaintiff law firms, which usually take cases on a contingent fee basis, join together to prosecute major complex cases because doing so allows them to leverage their resources and spread the risks of unfavorable outcomes."); *but see Milestone II*, 187 F.R.D. 165, 176 (observing the approval of multiple lead counsel may engender inefficiency in class action litigation).

The potential for duplicative services and the concomitant increase in attorneys' fees work against the approval of more than one law firm, especially in cases in which one law firm has the proven ability to adequately manage and litigate securities class actions. *See Milestone II*, 187 F.R.D. 165, 176; *Chill*, 181 F.R.D. at 413 (the structure of proposed leadership should not be "too distended to efficiently manage the prosecution of th[e] action"); *Reiger v. Altris Software, Inc.*, 1998 U.S.Dist. LEXIS 14705, at *15–16, *18 (S.D.Cal. 11 Sept. 1998) (observing the enlargement of the number of lead counsel may "unnecessarily increase the time and expense spent on preparing and litigating the case"); *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 491 (W.D.Mich.1994) (quoting Manual for Complex Litigation 2nd § 20.22 at 16) (stating " 'the number [of lead counsel] should not be so large as to hamper the unity of direction that is needed' ").

The limitation in the PSLRA of total attorneys' fees to "a reasonable percentage of the amount of damages and prejudgment interest actually paid to the class," *see* 15 U.S.C. § 78u–4(a)(6), does nothing to increase, much less regulate, the efficiency of multiple counsel. This provision neither guarantees the reasonableness of fees nor the non-duplication of services. *See Milestone II*, 187 F.R.D. 165, 176–177.

As recently observed, moreover, "a court's expertise is rarely at its most formidable in the evaluation of counsel fees." *Cendant*, 182 F.R.D. at 150; *see also Milestone II*, 187 F.R.D. 165, 176–177; *Raftery v. Mercury Finance Co.*, No. 97–624, 1997 WL 529553, at *2 (N.D.Ill. 15 Aug. 1997) ("[T]hat the court will be able to divine the reasonable value of

the services rendered [by attorneys] when the time comes [is] a false proposition."); *but see Oxford*, 182 F.R.D. at 50 (appointment of co-lead counsel contingent on the non-duplication of attorneys' fees); *Lax*, 1997 WL 461036, at *7 (appointing two law firms as co-lead counsel "provided that there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorneys' fees and expenses"); *Nager v. Websecure, Inc.*, 1997 WL 773717, at *1 (D.Mass. 26 Nov. 1997).

It is not possible, during the preliminary stages of litigation, to evaluate the potential of, much more guarantee, the non-duplication of services or the reasonableness of attorneys' fees during the course of the prosecution of the action. It is, however, possible at the outset of the litigation, to structure lead counsel so as to avoid the inevitable inefficiency and expense resulting from an inappropriate multiple lead counsel arrangement.

 Additionally, where more than one lead counsel is appointed, there is the potential they may ultimately seize control of the litigation, an occurrence the PSLRA intended to foreclose. As discussed, the PSLRA was designed, in part, to effectuate the transfer of control of securities class actions from the lawyers to the investors. *See* Conference Report at 685. Accordingly, those seeking the appointment of more than one law firm must demonstrate the lead plaintiff will be able to withstand any limitation on, or usurpation of, control, and effectively supervise the law firms acting as lead counsel. *See Milestone II*, 187 F.R.D. 165, 176–77.

 The selection of counsel by a lead plaintiff also must be the product of independent, arms length negotiations. This Circuit has observed: "[T]he lead attorney position is coveted as it is likely to bring its occupant the largest share of the fees generated by the litigation." *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1277 (3d Cir.1994); *see also Milestone II*, 187 F.R.D. 165, 177–78. Consequently, there arises the possibility that several law firms may exert pressure on the lead plaintiff. In *Raftery*, the court expressed concern about a retainer agreement between the proposed lead plaintiff and a law

firm where there appeared the possibility of an early settlement. 1997 WL 529553, at *2. The court suspected the cap of thirty-three and one-third percent on the retainer agreement was "not the result of hard bargaining." *Id.* It was observed that a reasonable fee is the lowest fee "that would be paid by a discerning client in an arms length negotiation." *Id.*

Not only should the proposed counsel fees be the result of hard-bargaining, but the initial selection of counsel should also be the result of independent decision-making by the lead plaintiff. In *Milestone I,* it was observed "unless there has been active, effective client participation in the [selection] process, it is possible that the counsel arrangement may simply reflect bargaining among lawyers for their own stake in the case, and not serve the best interests of the class." *Id.,* 187 F.R.D. 165, 177–78.

■ In the instant case, Proposed Lead Plaintiffs seek approval of their selection of the law firms of Weiss & Yourman and Bernstein Liebhard & Lifshitz to serve as co-lead counsel. It appears both of these firms have experience in prosecuting complex securities actions and are qualified to represent the Proposed Class in the instant action. *See* Proposed Co-counsel Firm Resumes, attached to Egan Aff. as Exh. E.

The firm of Bernstein Liebhard & Lifshitz was formed in 1993 and has offices in the states of New York and New Jersey. *See* Proposed Co-counsel Firm Resumes, attached to Egan Aff. as Exh. E. Since its inception, Bernstein Liebhard & Lifshitz has participated as lead or executive committee counsel in several securities class actions in which settlements have been obtained. *See id.*

The firm of Weiss & Yourman asserts it has litigated hundreds of class actions brought under the Federal securities laws and shareholder class and derivative actions brought to remedy violations of corporate and fiduciary duties. *See* Proposed Co-Counsel Firm Resumes, attached to Egan Aff. as Exh. E. Weiss & Yourman cited forty-one actions in which it participated as lead or co-lead counsel and in which settlements have been obtained. *See id.*

Proposed Lead Plaintiffs argue the appointment of co-lead counsel would be proper, and assert the instant case is distinguishable from *Milestone II,* in which the selection of more than one law firm as lead counsel was not approved. *See* Moving Brief at 21–25. Proposed Lead Plaintiffs observe the lead plaintiffs in *Milestone II* sought the appointment of several law firms to serve either as lead counsel or as members of an executive committee. *See id.* at 22–23 (citing *Milestone II,* 187 F.R.D. 165, 176). Proposed Lead Plaintiffs assert there is no risk, in the instant litigation, of unnecessary and wasteful efforts by counsel that would result from the litigation by committee approach. *See id.* at 23. Proposed Lead Plaintiffs argue the instant case is distinguishable from *Milestone II* because the appointment of two law firms as co-lead counsel does not raise similar concerns as the appointment of several law firms to serve as co-lead counsel and members of an executive committee. *See id.* at 22–23 (noting co-lead counsel is not the equivalent of an executive committee or "some other complicated structure of plaintiffs' counsel" designed to usurp control of the litigation).

In the instant action, Krasnow and Slater Asset, who have been appointed as lead plaintiffs, are an individual investor and an institutional investor, respectively. It does not appear Krasnow and Slater Asset will experience difficulty in controlling the instant litigation if two law firms are appointed to serve as co-lead counsel.

Further, the Proposed Lead Plaintiffs and Proposed Co-counsel have submitted a proposed order for the selection of co-lead counsel providing for the submission of bi-monthly reports to the court detailing the services rendered, the time, lodestar and expenditures of counsel and the hourly charges reasonably incurred in the prosecution of the instant litigation. Given the potential class size, the nature of the instant litigation and the relatively small size of the law firms selected by Proposed Lead Plaintiffs, it appears the instant case presents one of a limited number of circumstances in which the

appointment of co-lead counsel is appropriate.

As mentioned, Bernstein Liebhard & Lifshitz and Weiss Yourman appear to be capable of managing the instant litigation. The selection of Bernstein Liebhard & Lifshitz and Weiss & Yourman as co-lead counsel is appropriate. This conclusion, however, is premised upon the unique facts of the instant case, and is made only after careful consideration had been given to the concerns presented by the appointment of more than one law firm as lead counsel. As argued by Proposed Lead Plaintiffs, it does not appear the appointment of two law firms as co-lead counsel in the instant matter will lead to duplicative efforts by counsel, absence of coordination or delay, or increased costs to the Proposed Class. Further, the submission of bi-monthly reports detailing the services rendered by counsel, the time expended, and the hourly charges and expenses reasonably incurred in the prosecution of the instant case shall be required to prevent the duplication of efforts and ensure the reasonableness of the fees incurred. On this basis, the Lead Counsel Motion is granted. Bernstein Liebhard & Lifshitz and Weiss & Yourman are selected to represent the Proposed Class with Retention Plaintiffs Krasnow and Slater Asset serving as lead plaintiffs.

*Conclusion*

For the foregoing reasons, the Lead Plaintiffs Motion is granted in part and denied in part; the Lead Counsel Motion is granted. The In/out Plaintiff members of the Proposed Class are given leave to file a new complaint consistent with this Opinion.